All relief not herein granted is denied.

In re ALL TOOL RENTAL,
INC., Debtor.

ALL TOOL RENTAL, INC., Plaintiff,

v.

Donald WELLS & Veronica Wells, Ralph James & Lois Frengel, and Ralph George Frengel and the United States of America, Defendants.

Bankruptcy No. 82–01368–BKC–JAG.
Adv. No. 83–0532–BKC–JAG–A.

United States Bankruptcy Court,
S.D. Florida.

Jan. 24, 1984.

Reggie D. Sanger, Fort Lauderdale, Fla., for debtor.

Roger G. Stanway, Hollywood, Fla., for the Wellses.

R.J. Fegers, Hollywood, Fla., for the Frengels.

Ira F. Gropper, Pembrake Pines, Fla., for the United States.

## FINDINGS AND CONCLUSIONS

JOSEPH A. GASSEN, Bankruptcy Judge.

This cause came to be heard on August 1, 1983, upon the Complaint of the Plaintiff/Debtor, ALL TOOL RENTAL, INC., to Determine Nature, Extent or Validity of Lein.

ALL TOOL filed a Voluntary Petition in Bankruptcy under Chapter Eleven on August 13, 1982. Subsequently, on June 1, 1983, ALL TOOL filed this adversary proceeding under Rule 701, now Rule 7001, et al., Bankruptcy Rules, to determine the validity, priority, and extent of the secured status of the following three claims:

1. The claim of RALPH GEORGE FRENGEL, LOIS FRENGEL, and RALPH JAMES FRENGEL, (hereinafter referred to collectively as the FRENGELS), of a security interest in the three (3) outstanding shares of stock in the Debtor, and in the Debtor's fixtures, equipment and rental inventory and leasehold estate, arising from a Security Agreement, dated May 2, 1974, between the FRENGELS and the Debtor. This Security Agreement is part of Composite Exhibit 1, before the Court at the August 1, 1983, hearing.

2. The claim of DONALD WELLS and VERONICA WELLS, (hereinafter referred to as the WELLSES), of a security interest in 1 and ½ shares of stock in the Debtor and in the Debtor's fixtures, equipment, rental inventory, lease and leasehold estate, arising from a Security Agreement dated February 29, 1980, between the WELLSES and the Debtor. This Security Agreement is part of Composite Exhibit 3.

3. The Claim of the UNITED STATES OF AMERICA of a lien for taxes owed by the Debtor to the Internal Revenue Ser-

vice, arising from the filing of notices of tax lien on September 25, 1980, and March 16, 1982. These notices were before the Court as attachments to the United States Proof of Claim, marked Exhibit 5.

Answers were filed by all the Defendants, each claiming a secured interest with priority over the others. A hearing was had on August 1, 1983, whereat all the parties, except the FRENGELS, appeared and presented testimony. The Court has considered that testimony as well as the arguments and memoranda of counsel.

### FINDINGS OF FACT

The parties are in substantial agreement as to the facts upon which the Court bases its determination.

The FRENGELS were the owners of all the outstanding shares of the Debtor in 1974, when it was known as RALPH'S RENTAL SERVICE, INC. On May 2, 1974, the FRENGELS sold all their shares in the Debtor to JOSEPH KELLER and MARY KELLER, his wife, (hereinafter referred to as the KELLERS), and the WELLSES, and received in return a promissory note of even date secured, pursuant to a Security Agreement, by a lien on the stock and property of the Debtor. This agreement was modified by a Modification Agreement, dated May 1, 1975, and the FRENGELS were given a second promissory note of even date secured by the same Security Agreement and lien as the note of May 2, 1974. The FRENGELS security interest was perfected by the filing of a Uniform Commercial Code Financing Statement with the Florida Secretary of State on May 15, 1974. No continuation statement was ever filed, as provided by Section 679.-403, Florida Statutes. The parties stipulated at the hearing that a balance of $1500.00 remained owing from the Debtor to the FRENGELS on the notes.

On February 29, 1980, the WELLSES and the Debtor, now known as ALL TOOL RENTAL, INC., entered into a buyout agreement under which the WELLSES sold their interest in the Debtor to the Debtor in exchange for, among other consideration, a promissory note secured by a lien on one-half the stock and all the property of the Debtor. In connection with this sale, the Debtor, through its President, JOSEPH KELLER, signed a Security Agreement and a Financing Statement which met all the requirements of the U.C.C. These documents were all before the Court as Composit Exhibit 3.

The Financing Statement, signed by KELLER, was filed with the Florida Secretary of State on July 22, 1980. Just how the Financing Statement came to be filed was never made clear to the Court.

Paragraph 6 of the Agreement for sale concerns the Financing Statement and its filing and reads as follows:

"6. As security for payment of the promissory note, ALL TOOL shall execute a Security Agreement in favor of WELLS on one and a half (1½) shares of stock being sold to ALL TOOL in addition to all fixtures, equipment, rental inventory, lease and leasehold estate of ALL TOOL, and WELLS is authorized to file a Financing Statement with the Secretary of State. The parties understand and acknowledge that the one and a half (1½) shares of WELLS stock being sold to ALL TOOL, as well as the fixtures, equipment, rental inventory, lease and leasehold estate of ALL TOOL are presently encumbered by a Security Agreement and Financing Statement in favor of Ralph G. Frengel, Lois Frengel and Ralph James Frengel, and said security interest shall remain until such time as the indebtedness to the Frengels is paid in full. Therefore, a Security Agreement, Escrow Agreement, and Financing Statement will be held in escrow by Atkinson, Golden, Bacen & Diner, P.A., hereinafter "ESCROW AGENT", until such time as the indebtedness with the Frengel parties is paid in full and their security interest is cancelled. At such time as the Frengel indebtedness is paid in full, ALL TOOL shall direct the current Escrow Agent holding the stock certificates of ALL TOOL to forward same to the Escrow Agent under this Agreement, and upon receipt of same, Escrow Agent shall be authorized to record the

Financing Statement with the Secretary of State, and the provisions of the Security Agreement and Escrow Agreement signed in accordance with the terms contained herein shall become in full force and effect. It is the parties (sic) intent to comply with the Security Agreement now issued in favor of the Frengel parties, and therefore, they desire to not further encumber the subject property until such time as the first Security Agreement is extinguished."

At the hearing, the parties stipulated that the Debtor still owed $37,270.07 on the WELLSES' promissory note.

THE UNITED STATES claims a total secured claim of $3,305.52, in favor of the Internal Revenue Service, which sum the parties have stipulated to be owing from the Debtor to the UNITED STATES. The total represents various taxes, penalties, and interest due as of the Bankruptcy petition date. The breakdown is unimportant, the operative fact being that the first notice of tax lien was filed on September 25, 1980.

The parties have stipulated at the hearing that the Debtor owns the following property with the following values:

1. Office equipment and furnishings $210.00
2. Rental inventory $10,000.00

The Debtor, therefore, has a total of $10,-210.00 of property against which these three claims could be secured. The evidence showed that $700.00 of the inventory was acquired after November 9, 1980, or 45 days after the filing of the first UNITED STATES notice of tax lien.

The issue for this Court's determination is whether and to what extent each of these claims is secured as against the property of the Debtor and what priority each has as against the others.

### CONCLUSIONS

■ 1. The debtor-in-possession contends that it (standing in the shoes of a trustee) has priority over the FRENGELS because their perfection lapsed when they failed to file a continuation of their financing statement before expiration of the five year effective period under Fla.Stats. § 679.403(3). This court agrees, and concludes that the FRENGELS are unsecured creditors only.

2. As to the WELLSES' Security Agreement, the debtor-in-possession argues that there would have been no valid, perfected Security Agreement against it without the violation of the Escrow Agreement by the WELLSES and that therefore the Security Agreement and the perfection of it through filing a Financing Statement are void, and of no effect against it.

There is no dispute over the fact that All Tool Rental, through the KELLERS, signed a Security Agreement and Financing Statement which met all the requirements of the Uniform Commercial Code, and that the Financing Statement was filed with the Florida Secretary of State, as prescribed by the U.C.C. to perfect security interests of the type in question. The significant issue before this court is whether the Security Agreement "attached" under the provisions of the U.C.C., or whether, instead, the circumstances of the transaction prevented attachment.

Fla.Stats. § 679.203(2) provides: "A security interest attaches when it becomes enforceable against the debtor with respect to the collateral. Attachment occurs as soon as all of the events specified in subsection (1) have taken place unless explicit agreement postpones the time of attaching." In this case no one contends that the events of subsection (1) did not take place.

The debtor and the IRS argue that documents released in violation of escrow are not effective, and that there was no delivery of the Security Agreement and Financing Statement here, because ALL TOOL never agreed to such delivery. However, the common law regarding the effect of violations of escrow agreements and delivery or the lack thereof is not operative here. It has been superseded by the statute quoted above. The effect of the U.C.C. provisions on secured transactions is to say that if a debtor and creditor take certain actions and create a certain type of docu-

ment, a security agreement exists. Whether the parties wish to call it that or not, under the U.C.C. it is a security agreement. If they wish to agree to having a security interest enforceable only at a future time they can either wait to execute the documents or they can comply with the statute and include an "explicit agreement" which postpones the time of attaching.

The Security Agreement which the parties signed here does not itself include any agreement, explicit or otherwise, that it not attach immediately. Instead, the giving of the security interest is phrased entirely in the present tense, and it provides that the secured party "is hereby authorized" to file a financing statement.

■ Section 679.203(2) does not state specifically whether or not the explicit agreement must be within the security agreement itself. It is logical that such an agreement should at least be incorporated by reference, in conformance with the intent of the U.C.C. to simplify, expedite, and make uniform commercial transactions. Assuming for the moment, however, that a completely separate document could contain the required explicit statement, the "Agreement" between ALL TOOL and the WELLSES must be examined. Considering the document in its entirety, but without reference to extrinsic evidence as to the intent of the parties, the court concludes that it does not provide the explicit agreement needed, because it has contradictory provisions which result in ambiguity. In Paragraph 6 it first states that ALL TOOL shall execute a Security Agreement, and WELLS "is authorized to file a Financing Statement". Subsequently it provides that "a" Security Agreement, Escrow Agreement and Financing Statement will be held in escrow until the FRENGEL indebtedness is paid in full, and that the Security Agreement and Escrow Agreement "shall become in full force and effect" upon receipt by the escrow agent of the ALL TOOL stock certificates, which were to be directed to be released upon payment of the FRENGEL indebtedness. Finally Paragraph 6 states: "It is the parties (sic)

intent to comply with the Security Agreement now issued in favor of the FRENGEL parties, and therefore, they desire to not further encumber the subject property until such time as the first Security Agreement is extinguished." However, Paragraph 9 sets forth what acts will constitute default on the promissory notes, and states that WELLS shall be entitled to foreclose on his security interest upon default.

The nature of the defaults described are such that a default might have occurred immediately after execution of the promissory notes, and certainly before conditions occurred for the release of the escrow. A security agreement may be enforceable by a creditor against a debtor whether or not perfection has occurred, but only after attachment, (the act in question), has occurred, because that is the very definition of "attachment" under § 679.203. Therefore, this provision of the agreement is contrary to the escrow provision, even if one concludes that the beginning of Paragraph 6 was merely inartfully worded.

It is apparent that the parties had conflicting desires at the time of the execution of these documents. Although the WELLSES did not want to violate the FRENGEL Agreement, they wanted a security interest in the property in question. ALL TOOL wanted to give the security interest, to enable the purchase transaction to occur, but the KELLERS also did not want to violate the FRENGEL Agreement. From this document alone the court cannot conclude which desire the parties wished to prevail if they couldn't "have their cake and eat it too". Although there are fairly explicit statements that are equal to a statement that the Security Agreement should not attach, there are equally explicit statements to the contrary. The court cannot conclude that the "Agreement" provides the explicit statement required by § 679.203(2). Therefore, under that section the Security Agreement attached immediately.

■ This leaves the simpler question of perfection. Had there been no attachment of the Security Agreement there could

have been no perfection, and therefore no enforceability against the debtor-in-possession. All other elements of perfection were completed, however, and since the court has found that the Security Agreement attached, it was also perfected. ALL TOOL argues that the filing could not be effective because the financing statement should not have been removed from escrow. This argument has even less merit as to filing than to attachment. It runs counter to every concept of Article 9 of the U.C.C. to say that all the steps necessary to create and perfect a security agreement may be completed but that the filing in the official records is a nullity because someone did not want it filed. Once the Debtor signed a financing statement it created the possibility that the document could be filed and be effective against it. If the Debtor was determined to sign such a document it could still protect itself by preventing attachment of the security interest under the methods discussed above. The entire structure of perfection would be undermined if third parties could not rely on the validity of a financing statement in the public record which on its face complied with all provisions for validity.

The court has found few cases providing guidance on the "explicit agreement" issue. Most involved stock pledge agreements with possibly ambiguous language, and found that there was no explicit agreement that a security interest not attach. However, the facts in these cases do not present as close a question as the facts in the case at bar, and are not particularly helpful. See *Allegaert v. Chemical Bank,* 657 F.2d 495 (2d Cir.1980); *In Re Copeland,* 531 F.2d 1195 (3d Cir.1976); *Smith v. Dean Vincent, Inc.,* 47 Or.App. 887, 615 P.2d 1097 (1980); and *Barton v. Chemical Bank,* 577 F.2d 1329 (5th Cir.1978). In the case of *In re Dolly Madison Industries, Inc.,* 351 F.Supp. 1038 (D.C.E.D.Pa.1972) the court found that no security agreement had been created. In that instance there was no separate document as a security agreement but an escrow agreement which the court found to be a true escrow agreement and not a present pledge of collateral.

The purchase agreement contained the provision, "In the event that AFL shall be in default ... the escrow agent ... shall deliver the certificates to the seller, whereupon seller's rights ... shall be those of a secured party holding collateral under the provisions of Article IX of the Uniform Commercial Code...." Since there was no other language creating a security agreement the court found that the parties intended that a security interest attach only upon an uncured default. The language of this agreement is quite different from the executed Security Agreement and the ambiguous "Agreement" of the case at bar.

The actions which occurred may very well have been a breach of the agreement between ALL TOOL and the WELLSES and also of the agreement between the parties and the FRENGELS. If so, the aggrieved parties may seek damages for the breach. This is an entirely separate issue from the question of the validity of the security interest, however.

■ 3. The final issue is whether, and to what degree, a lien in favor of the Internal Revenue Service has priority over the WELLS security interest. The court is persuaded by the argument of the IRS that it has a prior lien in the amount of $700, and so finds and concludes. The first tax lien of the IRS was filed after the financing statement. Since the court has found that the financing statement perfected the WELLS security interest, they have priority as to collateral owned by the debtor prior to the filing of the tax lien. Under 26 U.S.C. § 6323(c)(1)(A)(i) and (c)(2) and *Rice Investment Co. v. U.S.,* 625 F.2d 565 (5th Cir.1980), however, the IRS would have priority as to property acquired by the debtor subsequent to 45 days after the tax lien was filed. The evidence showed that $700 worth of inventory was acquired by the debtor subsequent to that date and the IRS lien has priority in the amount of $700.

Pursuant to Bankruptcy Rule 9021(a) a separate Final Judgment incorporating these Findings and Conclusions is being entered this date.